UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| DAVINA MUTHUSAMI,<br><br>        Plaintiff,<br><br>v.<br><br>THE KRAFT HEINZ COMPANY, MONDELEZ INTERNATIONAL, INC., POST HOLDINGS, INC., THE COCA-COLA COMPANY, PEPSICO, INC., GENERAL MILLS, INC., NESTLE USA, INC., KELLANOVA, WK KELLOGG CO, MARS INCORPORATED, AND CONAGRA BRANDS, INC.,<br><br>        Defendants. | Case No.: 6:26-cv-00113-JSS-NWH |

**DEFENDANTS' OMNIBUS MOTION TO DISMISS
PLAINTIFF'S COMPLAINT**

## TABLE OF CONTENTS

Introduction ...................................................................................................3

Statement of Pleaded Facts .............................................................................7

Legal Standard .............................................................................................10

Argument .....................................................................................................12

I.   The Complaint Is An Improper Shotgun Pleading.......................................12

II.  Florida's Long-Term Food Consumption Liability Statute Bars All Of
     Plaintiff's Claims And Theories ..............................................................15

     A.   The plain language of Section 768.37 bars Plaintiff's claims as
          alleged.......................................................................................16

     B.   No exception to Section 768.37 applies ..........................................18

     C.   Legislative history and context confirm that Plaintiff's claims are
          barred.......................................................................................19

III. Plaintiff's Claims Fail For Lack of Causation.............................................22

     A.   Plaintiff does not identify any specific products that allegedly
          caused her injuries .....................................................................23

     B.   Plaintiff does not plausibly plead either general or specific
          causation ..................................................................................26

IV.  Plaintiff's Claims Are Barred By The First Amendment .............................32

V.   Plaintiff's Claims Are Preempted By Federal Law......................................34

     A.   USDA preemption bars claims regarding meat and poultry
          products ...................................................................................34

     B.   Plaintiff's vague pleading improperly attempts to evade FDA
          preemption ...............................................................................37

VI.  Each Of Plaintiff's Claims Fails For Additional Reasons.............................39

     A.   Plaintiff fails to adequately allege negligence and strict liability
          (Counts I–III) ............................................................................39

          1.   The failure-to-warn claims (Counts I and II) fail because
               Plaintiff has not adequately pleaded duty or warning
               causation ...........................................................................39

          2.   Plaintiff's design-defect claims (Counts I and III) fail
               because she does not identify what was defective about
               any specific food or beverage ...............................................44

B.    Plaintiff fails to plead any breach of an implied warranty of
fitness for a particular purpose (Count IV)...........................................46

C.    All fraud and deception-based claims fail for multiple reasons
(Counts V–VII)....................................................................................47

    1.    Plaintiff has not adequately alleged any false statement or
reliance...................................................................................48

    2.    Plaintiff cannot state an omission claim under the Florida
False Advertising Statute (Count VII) ....................................51

    3.    Plaintiff's fraudulent concealment claim further fails for
lack of a duty to disclose (Count VI) ......................................51

D.    Plaintiff's conspiracy (Count VIII) and concerted action (Count
IX) claims also fail for multiple reasons...............................................52

    1.    Plaintiff has not alleged an underlying tort ..............................53

    2.    Plaintiff does not plausibly allege an agreement to
accomplish an unlawful result.................................................54

VII.    The Court Should Dismiss All Of Plaintiff's Claims Against Mondelēz
International And Post Holdings For Lack Of Personal Jurisdiction.............57

Conclusion ...................................................................................................60

## INTRODUCTION

Plaintiff Davina Muthusami alleges that she developed pediatric type 2 diabetes as a result of her long-term consumption of "ultra-processed foods" manufactured by the eleven Defendants.[1] Plaintiff offers varying and shifting definitions of "ultra-processed foods," but contends that those foods and drinks comprise approximately 73% of the American food supply and 67% of the average child's diet. Although Plaintiff seeks to hold eleven food and beverage manufacturers wholly responsible for her diagnosis, the Florida Legislature has barred exactly these types of claims against manufacturers, and courts nationwide have repeatedly rejected similar claims as implausible and speculative under federal pleading standards. Indeed, a federal court recently dismissed a lawsuit with similar allegations brought against the same eleven Defendants, holding that the complaint was an improper "shotgun pleading[]" and did not "plead more than the mere possibility of causation." *Martinez v. Kraft Heinz Co.*, No. 25-377, 2025 WL 2447793, at *2–3 (E.D. Pa. Aug. 25, 2025). Plaintiff's Complaint fails for the same reasons, as well as several others.

*First*, Plaintiff's Complaint is a classic shotgun pleading of the type the Eleventh Circuit routinely condemns. Rather than set forth each individual Defendant's alleged misconduct, most of the Complaint's more-than 880 paragraphs contain undifferentiated allegations about "the UPF industry" or "Defendants" collectively.

---

[1] Defendants do not agree that the term "ultra-processed foods" or "UPF" reflects a valid method of categorizing foods and beverages (much less appropriately describes their products) and use the term only because the Complaint does.

This does not give the companies sued here adequate notice of the specific products, statements, or conduct that Plaintiff seeks to put at issue—and it is not sufficient to state a claim under the Federal Rules.

*Second*, all of Plaintiff's claims are barred by Florida's statutory "[l]imitation on civil liability arising from long-term consumption of food and nonalcoholic beverages." Fla. Stat. § 768.37. The relevant statute provides that no manufacturer, distributor, or seller of foods or nonalcoholic beverages can be held liable for any personal-injury claim premised on a "health condition related to weight gain or obesity" that results from the long-term consumption of those foods or beverages. *Id.* The plain language of the statute squarely forecloses Plaintiff's claims, which are predicated on the purported "explosion in obesity" she seeks to attribute to Defendants' foods and beverages. Doc. 1 ¶ 8. While Defendants dispute Plaintiff's allegations, those allegations, if accepted as true, put Plaintiff's claims squarely within the broad reach of Section 768.37. The case should be dismissed in full for that additional reason.

*Third*, Plaintiff fails to adequately allege causation. Each of Plaintiff's claims requires her to plausibly allege both that Defendants' foods and beverages are capable of causing pediatric type 2 diabetes (general causation) and that her consumption of Defendants' products actually caused *her* development of pediatric type 2 diabetes (specific causation). Plaintiff has not alleged facts sufficient to support either requirement. The Complaint merely lists dozens of *brand names* with different ingredients and manufacturing processes. It fails to identify *which* of the more than

1,000 distinct foods and beverages encompassed by those brands she consumed, let alone *which* ingredients and processes are even at issue. The Complaint also conflates correlation with causation, lacks any facts about Plaintiff's own health history, and does not plausibly allege that any of Defendants' foods or beverages were the proximate cause of her diagnosis. Absent plausible allegations of causation, Plaintiff's claims cannot proceed.

*Fourth*, Plaintiff's attempt to mandate "UPF" warnings runs afoul of the First Amendment's protections from compelled commercial speech. The warnings she seeks are controversial and opinion-based statements, and one federal court has already held that similar ingredient-warning mandates are likely unconstitutional.

*Fifth*, Plaintiff's claims are substantially or entirely preempted by federal law. Congress has enacted comprehensive legislation, implemented by the U.S. Department of Agriculture ("USDA"), regulating ingredients, food labeling, and *every* aspect of foods containing meat or poultry. Congress has likewise vested the Food and Drug Administration ("FDA") with comprehensive regulatory authority over ingredients and labeling of foods other than meat and poultry. Although Plaintiff pleads only vague, non-specific allegations—and thus prevents Defendants from conducting a meaningful preemption analysis as to individual products—her claims fail under any interpretation. And to the extent she seeks to impose requirements that differ from or exceed those mandated by the USDA or FDA, federal law squarely preempts those claims.

5

*Sixth*, each of Plaintiff's claims fails for a variety of other claim-specific reasons. Her failure-to-warn claims (Counts I and II) fail because: (i) Defendants did not have a duty under Florida law to warn of the risks inherent in consuming foods and beverages, and (ii) the Complaint does not plausibly allege any warning would have altered Plaintiff's behavior. Her design-defect claims (Counts I and III) fail because Plaintiff does not identify any particular defect in any particular food or beverage that supposedly caused her condition. Her breach of implied warranty of fitness for a particular purpose claim (Count IV) fails because Plaintiff does not allege pre-suit notice, privity with Defendants, or that she planned to use any particular food or beverage for a special purpose. Counts V–VII raise fraud-based claims that should be dismissed because Plaintiff does not sufficiently plead the misrepresentation and reliance elements under any standard, let alone with the particularity required for fraud-based claims. And Counts VIII–IX assert conspiracy claims against six of the eleven Defendants—The Kraft Heinz Company ("Kraft Heinz"), Mondelēz International, Inc. ("Mondelēz International"), Post Holdings, Inc. ("Post Holdings"), The Coca-Cola Company ("Coca-Cola"), General Mills, Inc. ("General Mills"), and Mars, Incorporated ("Mars")—without plausibly pleading that these Defendants entered into any agreement to act unlawfully.

*Finally*, the Court should independently dismiss all of Plaintiff's claims against Mondelēz International and Post Holdings because they are not subject to personal jurisdiction in Florida. Both Defendants are mere holding companies that do not

transact any business in Florida and did not manufacture, design, or sell any of the products or brands identified in the Complaint. They are not subject to general jurisdiction in this Court because they are not incorporated in this state and do not have their principal places of business here. *See Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). And they are not subject to specific jurisdiction because they did not play any role in the products or brands that allegedly caused Plaintiff's alleged injury—*i.e.*, they have no Florida-based contacts that "give rise to the liabilities [being] sued on." *Id.* at 138.[2]

For these reasons, discussed further below, the Court should dismiss the Complaint in full, with prejudice.

## STATEMENT OF PLEADED FACTS

Defendants are eleven prominent food and beverage manufacturers: Kraft Heinz, Mondelēz International,[3] Post Holdings,[4] Coca-Cola, PepsiCo, Inc. ("PepsiCo"), General Mills, Nestlé USA, Inc. ("Nestlé USA"), Kellanova, WK Kellogg Co ("WK Kellogg"), Mars, and Conagra Brands, Inc. ("Conagra"). These

---

[2] Mondelēz International and Post Holdings only join the remainder of this motion in the alternative and without any waiver of their challenges to personal jurisdiction.

[3] Mondelēz International is not a manufacturer, as set forth above and in Section VII, below. Its subsidiary, Mondelēz Global LLC ("Mondelēz"), is a manufacturer of food products.

[4] Post Holdings is not a manufacturer, as set forth above and in Section VII, below. Its subsidiary, Post Consumer Brands, LLC ("Post Consumer Brands"), is a manufacturer of food products.

companies offer Americans a wide array of foods and beverages, including cereal, rice, sports drinks, chocolate, seasonings, burgers, potato chips, soups, and more.

The Complaint proposes a broad and shifting definition of what constitutes an "ultra-processed food," or "UPF," and insists that Defendants' foods and beverages fall within it. *See* Doc. 1 ¶¶ 103–10. In one place, the Complaint bases this categorization "on the extensiveness of processing" and the inclusion of "industrially produced edible substances that are imitations of food." *Id*. ¶¶ 103, 107. Yet in other places, the Complaint provides a non-exclusive list of processes (including "hydrolysis, hydrogenation, or other chemical modifications" and other "industrial processes"), more than a dozen "ingredients" (including "whey protein"), and more than a dozen vague "additives" (including "flavors") that purportedly qualify a product as a "UPF"—whether individually or together, the Complaint does not say. *Id.* ¶¶ 107–09. Plaintiff alleges this vague concept of "UPF" encompasses "[c]urrently about 73% of the food in our food supply." *Id.* ¶ 354.

The crux of Plaintiff's lawsuit is that she developed pediatric type 2 diabetes after consuming Defendants' foods and beverages for many years. Doc. 1 ¶ 43. But Plaintiff does not identify **which** of Defendants' products she consumed. Indeed, Plaintiff identifies only four specific food products she allegedly consumed; the remaining 77 items on her alleged consumption list are **brands** of food that come in several varieties with different ingredients, processing, and marketing—totaling more than 1,000 discrete foods and beverages. *See id.* ¶¶ 603, 613, 623, 633, 643, 653, 663, 673, 683, 693.

Even within the brands she identifies, Plaintiff's allegations regarding consumption are not plausible. For example, she alleges she ate 18 different brands of cereal, 64 times each week, for at least the six years leading up to her alleged diagnosis, *see* Doc. 1 ¶¶ 623, 643, 653, 673, as well as waffles, Pop-Tarts, and other breakfast foods at least 18 times each week for 14 years straight, *see id.* ¶¶ 603, 653, 673. Collectively, she alleges that she ate and drank foods and beverages from the same named brands 287 times *every single week for years*. That amounts to 41 of the named brands *every single day*. The Complaint provides no other meaningful allegations about Plaintiff's diet, including what other "UPFs" she consumed from other manufacturers, restaurants, and food providers or what non-"UPFs" she ate on a regular basis. Nor does it include any allegations about her physical activity, genetics, family history, or other health and lifestyle factors that are known to contribute to pediatric type 2 diabetes.

The Complaint also includes screenshots of purported ads from some—but not all—Defendants. Doc. 1 ¶¶ 323–46. Plaintiff does not allege the ads contain any false or misleading information; she instead contends that the ads were designed to "target children" with "UPF marketing." *Id.* ¶ 346. Plaintiff does not specify whether she ever saw any of these ads, when she saw them, or whether she (or any adult purchasing food for her) purchased any of Defendants' products as a result. Indeed, many of the ads Plaintiff identifies allegedly aired *after* she was diagnosed with pediatric type 2 diabetes in January 2022. *See id.* ¶¶ 324, 342, 344–45.

Notably, large portions of the Complaint are copied verbatim or near-verbatim from a complaint filed by a different plaintiff in Pennsylvania last year. *See Martinez v. Kraft Heinz Co.*, No. 25-377 (E.D. Pa. Jan. 22, 2025), ECF No. 1-4 (attached as Ex. 1). The district court dismissed that complaint in its entirety, with prejudice, months before this Complaint was filed. *See* 2025 WL 2447793 (E.D. Pa. Aug. 25, 2025). Nevertheless, in addition to cutting and pasting substantive allegations from *Martinez*, Plaintiff has also copied portions of that complaint that are misleading or demonstrably false, including images of animal studies not related to any actual study conducted by Defendants, *see* Doc. 1 ¶¶ 162, 164, a fan-made ad featuring Pac-Man that Plaintiff falsely attributes to Mars, *see id.* ¶ 346; *see also* 1989gamemaster, *Pac-Man (Skittles Commercial)* (YouTube, Sep. 22, 2010), https://youtu.be/NWBa-Ba_Rsk?t=5, and misattributions of various foods and beverages to Defendants (Nestlé USA, for example, does not make, market, or sell Kit Kat in the United States, *cf.* Doc. 1 ¶ 663).

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).[5] While a court generally accepts the complaint's allegations as true, it need not accept as true allegations that are contradicted by exhibits to the complaint or by judicially noticeable facts. *Chapman v. Abbott Lab'ys*, 930 F. Supp. 2d 1321, 1323 (M.D. Fla. 2013). Plaintiff must plead facts

---

[5] Unless otherwise noted, internal quotation marks and citations are omitted.

10

showing "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. When a plaintiff has not pleaded facts sufficient to "nudge[] [her] claims across the line from conceivable to plausible," her "complaint must be dismissed." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Additionally, Plaintiff's fraud-based claims are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b), which demands that Plaintiff "state with particularity the circumstances constituting fraud or mistake." *Linville v. Ginn Real Est. Co., LLC*, 697 F. Supp. 2d 1302, 1306 (M.D. Fla. 2010). Accordingly, Plaintiff must support her allegations of fraud with "the who, what, when[,] where, and how" of the events at issue. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).

A defendant may also move to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). "A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Worldwide Aircraft Servs. v. Health Care Serv. Corp.*, No. 24-2644, 2026 WL 696813, at *2 (M.D. Fla. Mar. 12, 2026). And where a defendant challenges personal jurisdiction in a Rule 12(b)(2) motion to dismiss and submits evidence in support of its position, "the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Johnson v. Borell*, No. 25-80252, 2026 WL 1077623, at *2 (S.D. Fla. Apr. 21, 2026).

11

## ARGUMENT

### I.    The Complaint Is An Improper Shotgun Pleading

The Complaint should be dismissed on the ground that it is an impermissible "shotgun pleading." A complaint must consist of "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A "shotgun pleading"—that is, a complaint that asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions"—fails that standard, as it does not provide "adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). "Courts in the Eleventh Circuit have little tolerance for shotgun pleadings," in part because "[t]hey waste scarce judicial resources" and "undermine[] the public's respect for the courts." *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018).

Plaintiff's Complaint is a quintessential shotgun pleading. She has not explained "which of the defendants are responsible for which acts or omissions." *Weiland*, 792 F.3d at 1323. Instead, her allegations sweep in more than 1,000 unspecified foods and beverages spanning 80 brands from eleven distinct Defendants, relying on general "industry" practices. *See, e.g.*, Doc. 1 ¶¶ 11, 18, 181. For example, Plaintiff alleges that "[e]ach Defendant . . . incorporated colorings, flavorants, and other additives initially created for cigarettes into their products." *Id.* ¶ 357. But this allegation does not put any Defendant on notice as to what colorings, flavorants, additives, or even products are at issue. Likewise, the negligence claim broadly alleges that "[e]ach

Defendant . . . breached their duty to exercise reasonable care," without identifying the factual allegations that support this count or what the theory of liability is. *Id.* ¶ 711. Every cause of action features similarly vague allegations that fail to put Defendants on notice as to what actual conduct and which foods and beverages form the basis of each varying count. *See, e.g., id.* ¶¶ 732, 748, 766, 775, 791, 821, 849, 867.

The *Martinez* court dismissed a strikingly similar complaint for providing "insufficient notice of the claims against" each individual Defendant. 2025 WL 2447793, at *3 (citing *Weiland*, 792 F.3d at 1323). The court emphasized that the complaint included hardly any specific allegations about each Defendant, instead implicating "thousands of unidentified products and discuss[ing] the eleven Defendants as a group without specifying each Defendant's wrongful behavior." *Id.* The court held that "Plaintiff's shotgun approach makes it impossible for each Defendant to determine what conduct, design, promotion, sale, or product Plaintiff is referring to," and the court rejected the plaintiff's suggestion that he be able to refine his allegations via discovery, because "[a]llowing this case to proceed to discovery would run contrary to Rule 8's basic pleading requirements and work an undue burden on Defendants." *Id.*

Plaintiff copied the *Martinez* approach in full except that she has substituted the names of each Defendant throughout the Complaint. Some variation of this sentence construction appears at least 182 times in the Complaint:

13

> 389. Indeed, each Defendant – KRAFT HEINZ, MONDELEZ, POST HOLDINGS, COCA-COLA, PEPSICO, GENERAL MILLS, NESTLE, KELLOGG'S, MARS and CONAGRA – had actual knowledge that these consequences would occur.

Doc. 1 ¶ 389. This type of sweeping and undifferentiated allegation provides no detail as to the actual conduct at issue for each different Defendant. *See Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001) (per curiam) (finding shotgun pleading where complaint made "no distinction among the fourteen defendants charged, though geographic and temporal realities [made] plain that all of the defendants could not have participated in every act complained of").

Similarly, the Complaint improperly lumps together Kellanova and WK Kellogg and defines them collectively as "Kellogg's." Doc. 1 ¶ 92. But Kellanova and WK Kellogg have been distinct companies since 2023 and manufacture distinct products. The Complaint fails to assert any independent substantive allegations against Kellanova or WK Kellogg. Intentionally conflating two distinct defendants without specifying what each is alleged to have done is the very definition of inadequate notice.

Even where the Complaint provides supposed "examples" of relevant conduct—like the small number of advertisements that Plaintiff does not even allege to have seen, *id.* ¶¶ 323–46—the Complaint fails to explain which count those examples relate to, if any. *See Mohit v. West*, No. 20-813, 2020 WL 4547891, at *3 (M.D. Fla. Aug. 6, 2020) ("[T]he complaint commits the cardinal sin of shotgun

14

complaints—it fails to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests."); *see also Fed. Deposit Ins. Corp. v. Portnoy*, No. 13-1124, 2013 WL 12157160, at *1 (M.D. Fla. Aug. 9, 2013).

Further, every count "incorporates by reference" hundreds of previous paragraphs of the Complaint, making it impossible to tell which specific conduct each count is based on. "It is not the proper function of courts in this Circuit to parse out" "which specific factual allegations the plaintiff intends to support which of [her] causes of action." *Est. of Bass v. Regions Bank, Inc.*, 947 F.3d 1352, 1358 (11th Cir. 2020). Even more egregiously, Counts VIII and IX purport to incorporate all the other *counts. See Magluta*, 256 F.3d at 1284 (disapproving of complaint where "[e]ach count incorporate[d] by reference" 146 paragraphs of general factual allegations "while also incorporating the allegations of any count or counts that precede it"); *see also Weiland*, 792 F.3d at 1321 & n.11.

Because the Complaint fails to specify "which acts or omissions" each Defendant is allegedly responsible for under each count, the Complaint should be dismissed. *Weiland*, 792 F.3d at 1323.

## II.    Florida's Long-Term Food Consumption Liability Statute Bars All Of Plaintiff's Claims And Theories

Even if Plaintiff's Complaint were intelligible, though, the claims still fail. Plaintiff asserts only Florida law claims, all of which are barred by Section 768.37, Florida Statutes. That statute—entitled "Limitation on civil liability arising from long-term consumption of food and nonalcoholic beverages"—protects manufacturers from

15

liability for personal-injury claims premised on a "health condition related to weight gain or obesity" and resulting from the "long-term consumption of such foods or nonalcoholic beverages." *Id.* The statute was enacted in response to lawsuits filed against fast-food companies on theories of liability remarkably similar to those Plaintiff pursues here. *See* Fla. H.R. Comm. on Judiciary, HB 333 (2004) Staff Analysis 2 (Feb. 12, 2004) ("Judiciary Staff Analysis"). Because Plaintiff's claims—by her own allegations—fall squarely within the scope of the statute, the Complaint should be dismissed with prejudice on that additional ground.

### A.    The plain language of Section 768.37 bars Plaintiff's claims as alleged

Section 768.37 precludes liability where (1) the defendant is a "manufacturer, distributor, or seller of foods or nonalcoholic beverages intended for human consumption," (2) the claim is "premised upon a person's weight gain or obesity, or a health condition related to weight gain or obesity," and (3) the health condition allegedly "result[ed] from the person's long-term consumption of such foods or nonalcoholic beverages." Accepting Plaintiff's allegations as true, all three requirements are met here.

Plaintiff's own allegations establish the first and third requirements, nearly verbatim. As to the first requirement, the Complaint alleges that each Defendant is a manufacturer of foods and beverages. *See, e.g.*, Doc. 1 ¶¶ 4, 355, 357, 592. As to the third requirement, Plaintiff alleges that she began consuming Defendants' foods and beverages when she was two years old, *see, e.g., id.* ¶ 603, and that her pediatric "Type 2 Diabetes is the result of her long-term exposure to [Defendants'] UPF," *id.* ¶ 593; *see*

16

*also id.* ¶ 594 (Plaintiff's "consisten[t]" consumption of "UPF" "over the course of her lifetime" led to her diagnosis).

The second requirement—that the claims be premised upon a "health condition related to weight gain or obesity," § 768.37—also is easily satisfied by Plaintiff's allegations. "The phrase 'relating to' sweeps broadly," and generally means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Chevron USA Inc. v. Plaquemines Parish*, 146 S. Ct. 1052, 1060 (2026). Florida courts have emphasized the breadth of the phrase "related to," interpreting it to mean "being connected; associated." *D.L. v. Cmty. Based Care of Brevard, Inc.*, 429 So. 3d 1067, 1071–72 (Fla. 5th DCA 2026); *see also United States v. Hill*, 643 F.3d 807, 875 (11th Cir. 2011) ("[T]he participial phrase 'related to' is a broad one . . . ."). And, of course, "[o]ne thing can relate to another even if the connection is 'indirect.'" *Chevron*, 146 S. Ct. at 1060; *see also Republic Props. Corp. v. Grand Jury Presentment on the City of West Palm Beach*, 971 So. 2d 289, 292 (Fla. 4th DCA 2008) ("relating to" should be construed broadly and does not require a "significant" connection). As the Supreme Court recently confirmed, "related to" does not require a causal relationship. *Chevron*, 146 S. Ct. at 1060.

Here, the entire basis of Plaintiff's claims is the assertion that Defendants' foods and beverages are linked to overconsumption, weight gain, and obesity. *See, e.g.*, *id.* ¶¶ 112, 606, 608, 709, 711, 733, 748, 750, 766, 773, 775, 791, 821 (tying general allegations and every substantive count to alleged "overconsumption"). Indeed, the Complaint mentions "obesity," "obese," "weight gain," and "overweight" 50 times.

17

*See generally id.* That easily satisfies the "related to" requirement under the statute. Moreover, Plaintiff alleges that "obesity is a possible marker of Type 2 Diabetes," *id.* ¶ 373, further confirming her claims are broadly "related to" obesity.

In short, each of Plaintiff's claims seeks to impose liability for "personal injury" based on an alleged "health condition related to weight gain or obesity" and "resulting from" the "long-term consumption" of foods and beverages. Accordingly, they are barred under Florida law.

### B.    No exception to Section 768.37 applies

Because Section 768.37 forecloses Plaintiff's claims, the burden falls to her to establish an exception. *Meneses v. City Furniture*, 34 So. 3d 71, 74 (Fla. 1st DCA 2010). The statute provides only two exceptions to its broad coverage: when a defendant "failed to provide nutritional content information as required by any applicable state or federal statute or regulation," or when a defendant "has provided materially false or misleading information to the public." Fla. Stat. § 768.37. Neither exception applies here. And Plaintiff cannot invoke any other exceptions, because when a statute has "express exception[s]," it "implies that there are no *other* circumstances under which" an exception exists. *Jennings v. Rodriguez*, 583 U.S. 281, 300 (2018).

The first exception—failing to provide required nutritional information—does not apply as Plaintiff offers no such allegation here.

The second exception also does not apply. Not only has Plaintiff failed to identify any materially false or misleading information provided to the public, but she does not point to *any* public statement by any Defendant that was allegedly false or

18

misleading—nor any product bearing a label she alleges was false or misleading. And there are none.

The only specific statements that the Complaint identifies from any Defendant are a series of advertisements featuring characters and child actors, including some that aired after Plaintiff's January 2022 diagnosis. Doc. 1 ¶¶ 323–46. But Plaintiff does not identify anything in those advertisements that is "materially false or misleading." *See Volinsky v. Lenovo (U.S.) Inc.*, No. 23-25, 2024 WL 1299315, at *6 (M.D. Fla. Mar. 27, 2024) (dismissing false advertising claim under Florida law because plaintiff failed to "plead with particularity the exact misleading statements that the claim relies on"). Nor does Plaintiff allege that she actually viewed any false or misleading information relating to products allegedly consumed, much less that she (or her parents) relied on those statements when making food-purchasing decisions. *See infra* Section VI(C).

Because the Complaint's own allegations establish each element of Section 768.37 and plead no statutory exception, this ground alone warrants dismissal of Plaintiff's Complaint with prejudice.

## C.   Legislative history and context confirm that Plaintiff's claims are barred

Because the statute's plain language is clear, there is no need to resort to legislative history. *See Allen v. USAA Cas. Ins. Co.*, 790 F.3d 1274, 1282 (11th Cir. 2015) (applying Florida law). But to the extent there is any ambiguity in the text, under Florida law, "[l]egislative history can be helpful." *Hardee County v. FINR II, Inc.*, 221 So. 3d 1162, 1165 (Fla. 2017); *see also Allen*, 790 F.3d at 1282 (noting that

19

legislative history was "consistent with our plain reading of the Legislature's intended meaning"). Here, the legislative history confirms that Section 768.37 is intended to cover and bar claims like Plaintiff's.

Section 768.37 was enacted in response to lawsuits seeking to hold fast-food companies responsible for a plaintiff's obesity, weight gain, and/or type 2 diabetes. *See* Judiciary Staff Analysis at 2; *see also White v. State*, 714 So. 2d 440, 443 n.5 (Fla. 1998) (observing that staff analyses are "one touchstone of the collective legislative will"). The most notable of these suits was *Pelman v. McDonald's Corp.*, a New York personal-injury action alleging that McDonald's practices in "making and selling their products [were] deceptive and that this deception . . . caused the minors who . . . consumed McDonald['s] products to injure their health by becoming obese." 237 F. Supp. 2d 512, 516 (S.D.N.Y. 2003). Just as here, the plaintiffs in *Pelman* tried to hold a food company legally responsible because they had "developed diabetes." *Id.* at 519.

The Florida Legislature acted quickly to leave no doubt that such claims have no place in Florida courts. Although *Pelman* was dismissed, the Florida Legislature anticipated (correctly) that plaintiffs' lawyers would seek to employ the same litigation strategies in future litigation and passed Section 768.37 to proactively foreclose such actions. *See* Judiciary Staff Analysis at 2. Representative David Simmons, one of the bill's sponsors, explained: "This is legislation that emphasizes personal

20

responsibility . . . It assures that we are not deluged with frivolous lawsuits."[6] Florida was not alone in barring cases like *Pelman*: To date, 26 states have enacted similar statutes.[7]

Section 768.37 represents the Florida Legislature's measured judgment that food and beverage manufacturers who abide by federal and state regulations concerning ingredients and labeling should not be subjected to tort liability. Yet Plaintiff's claims—which by her count implicate 73% of the American food supply— seek to upend that judgment and impose significant public policy costs. A panoply of federal and state laws protects consumers from unsafe foods and beverages and from false or misleading packaging labels. Where, as here, a company has complied with those laws, a plaintiff cannot deputize the judiciary as the arbiter of public health. The potential disruption to the nation's food supply that would cause is precisely what the

---

[6] *Legislators seek to protect fast food from fat lawsuits*, Sarasota Herald-Tribune (Feb. 4, 2004), https://www.heraldtribune.com/story/news/2004/02/04/legislators-seek-to-protect-fast-food-from-fat-lawsuits/28786805007/.

[7] Ala. Code §§ 6-5-732 to 6-5-736; Ariz. Rev. Stat. Ann. § 12-688; Colo. Rev. Stat. Ann. §§ 13-21-1101 to 13-21-1106; Fla. Stat. § 768.37; Ga. Code Ann. §§ 26-2-430 to 26-2-436; Idaho Code Ann. §§ 39-8701 to 39-8706; 745 Ill. Comp. Stat. §§ 43/1–20; Ind. Code Ann. §§ 34-30-23-1 to 34-30-23-3; Kan. Stat. Ann. §§ 60-4801 to 60-4802; Ky. Rev. Stat. Ann. §§ 411.600 to 411.640; La. Rev. Stat. Ann. § 9:2799.6; Me. Rev. Stat. Ann. tit. 14, § 170; Mich. Comp. Laws Ann. § 600.2974; Mo. Rev. Stat. § 537.595; N.C. Gen. Stat. Ann. §§ 99E-40 et seq.; N.D. Cent. Code §§ 19-23-01 to 19-23-03; Ohio Rev. Code Ann. § 2305.36; Okla. Stat. Ann. tit. 76, §§ 38 to 40; Or. Rev. Stat. Ann. §§ 30.961 to 30.963; S.D. Codified Laws § 21-61-2; Tenn. Code Ann. § 29-34-205; Tex. Civ. Prac. & Rem. Code Ann. §§ 138.002 to 138.004; Utah Code Ann. §§ 78-4-302 to 78-4-306; Wash. Rev. Code Ann. § 7.72.070; Wis. Stat. Ann. § 895.506; Wyo. Stat. Ann. §§ 11-47-101 to 11-47-103.

Florida Legislature sought to avoid when passing Section 768.37. Plaintiff's claims run afoul of that law and must be dismissed.

### III.   Plaintiff's Claims Fail For Lack of Causation

Plaintiff's claims also fail because she does not plausibly allege that any particular product from any particular Defendant caused her to develop pediatric type 2 diabetes.

Every cause of action in the Complaint requires Plaintiff to plead a plausible theory of proximate causation. *Cassisi v. Maytag Co.*, 396 So. 2d 1140, 1143 (Fla. 1st DCA 1981) ("[Plaintiffs] have the burden, whether their case is founded in negligence, breach of an implied warranty, or strict liability, of establishing" that a certain defect "caused the injuries complained of"); *see also infra* Section VI(C) (fraud-based claims require causation in the form of reliance); *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 86–87 (Fla. 1976) (causation an element of product liability claims); Restatement (Second) of Torts § 402A(1) (1965) (similar); *Raimi v. Furlong*, 702 So. 2d 1273, 1284 (Fla. 3d DCA 1997) (conspiracy claims require causation). This means Plaintiff must "pinpoint[] a specific" defect and explain how that defect caused the alleged injuries, *Shapiro v. NuVasive, Inc.*, No. 19-23163, 2019 WL 5742159, at *2–3 (S.D. Fla. Nov. 5, 2019), based on something more than "pure speculation or conjecture," *Gooding v. Univ. Hosp. Bldg., Inc.*, 445 So. 2d 1015, 1018 (Fla. 1984); *see also Jimenez v. Holiday CVS, LLC*, No. 22-24242, 2023 WL 4251176, at *2–3 (S.D. Fla. June 29, 2023) (dismissing products liability claim in part because the complaint failed to plausibly allege proximate cause).

As discussed below, Plaintiff has not met this standard because: (1) she does not identify the specific foods and beverages at issue, making it impossible to connect any Defendant's products to her alleged health condition; and (2) she fails to plausibly allege either that any of Defendants' foods and beverages are capable of causing pediatric type 2 diabetes (general causation), or that they actually caused Plaintiff's health condition here (specific causation). Any of these defects independently justifies dismissal.

### A.    Plaintiff does not identify any specific products that allegedly caused her injuries

Instead of identifying the actual products at issue, Plaintiff almost exclusively invokes brand names that sweep in different products, ingredients, and manufacturing processes—an approach that itself requires dismissal. "It is well established under Florida law and elsewhere that identification of the product that caused the harm as the one sold or manufactured by the defendant is an essential element of traditional tort law." *Pulte Home Corp., Inc. v. Ply Gem Indus., Inc.*, 804 F. Supp. 1471, 1484–85 (M.D. Fla. 1992); *see Ray v. Cutter Lab'ys, Div. of Miles, Inc.*, 744 F. Supp. 1124, 1126–27 (M.D. Fla. 1990) (holding plaintiffs failed to satisfy proximate-cause requirements because they were unable to identify which defendant's particular product caused the alleged injury). The Eleventh Circuit has therefore required, as "*minimally* sufficient factual allegations," that a plaintiff identify some defect within a specifically identified product. *Bailey v. Janssen Pharmaceutica, Inc.*, 288 F. App'x 597, 607 (11th Cir. 2008)

23

(per curiam) (emphasis added); *see also Shapiro*, 2019 WL 5742159, at *2 (collecting cases requiring allegations about what is defective about a particular product).

Where a plaintiff identifies the products at too high a level of generality, courts routinely dismiss the claims. In *Gomez v. Pfizer, Inc.*, for example, the court dismissed a complaint that challenged the brands "Motrin" and "Tylenol," but failed to specify whether the plaintiffs had used over-the-counter Motrin and Tylenol, prescription versions, or some combination. 675 F. Supp. 2d 1159, 1163 (S.D. Fla. 2009). The court explained that the complaint failed "to put the [d]efendants on notice as to what *products* [p]laintiffs [were] claiming were defective." *Id.* Similarly, a court in this district dismissed claims involving flushable wipes because, although the plaintiffs had "alleged potentially six different wipes were responsible for the damages," they "did not identify which wipes caused the damage." *Sweeney v. Kimberly-Clark Corp.*, No. 14-3201, 2015 WL 5446797, at *6 (M.D. Fla. Sep. 15, 2015).

The same reasoning applies here. By pleading brand names that Plaintiff allegedly consumed—as opposed to specific foods or beverages—the Complaint fails to allege that any *particular product* actually caused Plaintiff's injuries. That failure is especially problematic here because the Complaint implicates more than 1,000 foods and beverages within the dozens of brands named by Plaintiff, all of which contain different ingredients and undergo different processes. *Cf.* Doc. 1 ¶¶ 107–10 (alleging *non-exhaustive* lists of ingredients and processing techniques, "such as fructose" or "colors," that "typically" go into "UPFs").

24

For example, Plaintiff claims that she consumed products sold under the Old El Paso brand (*id.* ¶ 653), but that brand encompasses at least 116 different products, including soups, tortillas, seasonings, sauces, and canned beans.[8] Even brands that some people may associate with a specific product—*e.g.*, Coke or Pepsi—almost always come in multiple variations with different flavors, ingredients, and production methods. With such variation in ingredients and manufacturing within the more-than 1,000 products covered by the broad brands Plaintiff alleges, there is no plausible theory of causation.

The *Martinez* decision is instructive on this point. There, the court dismissed a similar complaint purporting to challenge so-called "UPF" because the plaintiff "failed to identify what foods or products he consumed," and because a "plaintiff must at least designate the product alleged to be defective in order to recover from the one who sells it." 2025 WL 2447793, at *2 (quoting *Klein v. Council of Chem. Ass'ns*, 587 F. Supp. 213, 222 (E.D. Pa. 1984)). The court held that when a plaintiff fails to name specific products at issue, he or she necessarily fails to plead causation. *Id.* Although Plaintiff appears to have tried to plead around *Martinez* by adding alleged (implausible) weekly frequencies and approximate start dates for when she consumed products within each brand, Doc. 1 ¶¶ 603–93, that still says nothing about which products she consumed,

---

[8] *See* Old El Paso, *All Products*, https://www.oldelpaso.com/products. This Court may consider the Old El Paso website because it is central to assessing Plaintiff's claims and its authenticity cannot reasonably be challenged. *U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 (11th Cir. 2015).

in what quantity, with what formulation, under what label, after seeing what statement, or how those products caused her pediatric type 2 diabetes rather than the numerous other possible factors.

> **B.      Plaintiff does not plausibly plead either general or specific causation**

Even if Plaintiff had identified which of Defendants' foods and beverages are at issue, the Complaint still fails to plausibly allege general or specific causation. Plaintiff must plausibly allege that *each* food and beverage product at issue "*can* cause the harm [P]laintiff alleges" (general causation), and that *each* food and beverage at issue "in fact *cause[d]* the injury" (specific causation). *See McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1239 (11th Cir. 2005) (second emphasis added). Plaintiff has alleged neither.

*General Causation*. Plaintiff fails to allege that each specific food and beverage encompassed by the Complaint is capable of causing the alleged harm. None of the sources cited in the Complaint concludes that "UPFs" as a category—let alone any specific product produced by any particular Defendant—cause pediatric type 2 diabetes. Even taking Plaintiff's sources at face value, they suggest, at most, an association between "UPFs" (however defined in each particular study, and certainly nowhere limited or specific to *Defendants'* "UPFs") and various health outcomes. But "[i]n law, as in science, [c]orrelation is not causation." *Manuel v. Pepsi-Cola Co.*, No. 17-7955, 2018 WL 2269247, at *11 (S.D.N.Y. May 17, 2018); *see Becerra v. Dr Pepper/Seven Up, Inc.*, No. 17-5921, 2018 WL 3995832, at *9 (N.D. Cal. Aug. 21, 2018) (plaintiff's "cites do not cross the threshold from allegations of correlation to causation"), *aff'd*, 945 F.3d 1225 (9th Cir. 2019).

Although Plaintiff characterizes the studies as establishing causation, the Court need not accept that characterization. Where a plaintiff relies on third-party literature to substantiate a claim, it is appropriate for the court to examine that research, even at the pleading stage, to evaluate whether she has "overstated the actual science set forth in the citations." *Becerra v. Coca-Cola Co.*, No. 17-5916, 2018 WL 1070823, at *4 (N.D. Cal. Feb. 27, 2018); *see also In re Zantac (Ranitidine) Prods. Liab. Litig.*, 546 F. Supp. 3d 1152, 1172 (S.D. Fla. 2021) (reviewing the complaint's cited studies and determining that they did not clearly support plaintiffs' toxic-exposure causation allegations); *Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1206 (11th Cir. 2007) ("[W]hen the exhibits contradict the general and conclusory allegations of the pleading, the exhibits govern.").

*Manuel* is instructive. There, the plaintiffs brought consumer-fraud claims, alleging that the use of the word "diet" in Diet Pepsi was deceptive because artificial sweeteners allegedly impeded weight loss and led to weight gain. 2018 WL 2269247, at *10. The district court dismissed the complaint, noting that none of the studies cited therein concluded that sweeteners *caused* weight gain—they only observed a *correlation* between sweeteners and weight gain. *Id.* at *10–12. In short, the district court found, the plaintiffs "ha[d] outrun the science." *Id.* at *12. The Second Circuit affirmed, reiterating that "[n]one of the studies purports to establish a causal relationship between non-nutritive sweeteners and weight gain to a degree that is sufficiently strong." *Manuel v. Pepsi-Cola Co.*, 763 F. App'x 108, 109 (2d Cir. 2019).

27

Plaintiff's claims here likewise "outrun the science." *Manuel*, 2018 WL 2269247, at *12. Although the Complaint cites studies that purportedly suggest that "UPFs" (however defined in the particular study) generally pose health concerns, none found a causal relationship between any Defendant's specific products—or any of the particular ingredients or processing methods that Plaintiff asserts define a "UPF"— and pediatric type 2 diabetes. One of Plaintiff's studies, in fact, found that consumption of some kinds of "UPFs" was "associated with *lower* risk" for type 2 diabetes. Zhangling Chen et al., *Ultra-Processed Food Consumption and Risk of Type 2 Diabetes: Three Large Prospective U.S. Cohort Studies*, 46 Diabetes Care 1335, 1339–40 (2023) (cited in Doc. 1 ¶ 115 n.42) (emphasis added). No matter how the Complaint tries to frame it, the actual sources on which Plaintiff relies undercut any plausible theory of general causation.

The lack of a plausible theory of general causation is not surprising given the breadth of Plaintiff's different definitions of "UPF." Even if Plaintiff could allege that some particular ingredients increase the risk of pediatric type 2 diabetes, there is no plausible basis for asserting that every food or beverage falling within Plaintiff's broad umbrella of "UPF"—which purportedly includes all foods and beverages containing high-fructose corn syrup, gluten, whey protein, or artificial coloring, among many other possible ingredients—is an independent cause of pediatric type 2 diabetes. Indeed, although the Complaint lists various characteristics that can purportedly render a food "ultra-processed," it never explains *why* or *how* any of them—much less *all* of them—could plausibly cause pediatric type 2 diabetes. *See, e.g.*, Doc. 1 ¶¶ 107–

28

10 (listing ingredients, additives, and industrial processes typical to "ultra-processed foods"); *id.* ¶ 594 (invoking generalized biological mechanisms without tying them to a specific ingredient, process, or attribute).

*Specific Causation*. Nor does Plaintiff plausibly allege that each (or any) of Defendants' foods and beverages caused *her* pediatric type 2 diabetes. To allege specific causation, Plaintiff must plausibly allege that each food and beverage was a "substantial factor" in actually causing her alleged condition. *Guinn v. AstraZeneca Pharma. LP*, 602 F.3d 1245, 1256 (11th Cir. 2010) (per curiam) (quoting *Gooding*, 445 So. 2d at 1018). But Plaintiff does not allege facts that make it plausible—as opposed to merely possible—that Defendants' foods and beverages caused her pediatric type 2 diabetes.

Pediatric type 2 diabetes is a multifactorial disease. *See, e.g.*, *S.F. v. Archer-Daniels-Midland Co.*, No. 13-634, 2014 WL 1600414, at *4 (W.D.N.Y. Apr. 21, 2014); *Martinez*, 2025 WL 2447793, at *2 & n.1 (recognizing "the reality" that type 2 diabetes has "a multitude of causes"). Yet Plaintiff alleges no temporal connection between consumption of any food and the development of any symptom, nor what other foods and beverages she consumed, her overall physical condition, whether she has a family history of pediatric type 2 diabetes, or any other facts that would plausibly show that it was *these eleven Defendants'* products that caused her diagnosis. The Complaint contains no information about *this Plaintiff* that would make it plausible that these foods and beverages—manufactured and sold without defects and in full compliance

29

with federal and state regulations—were the actual, proximate cause of her pediatric type 2 diabetes.

Courts have rejected claims for failure to plausibly allege specific causation in similar circumstances. For example, in *S.F.*, the plaintiff sued manufacturers of high-fructose corn syrup, alleging it was a substantial factor in causing her 14-year-old daughter to develop type 2 diabetes. 2014 WL 1600414, at *1, *3. The court dismissed all claims for failure to allege causation. *Id.* at *9. The court "dr[e]w on its judicial experience and common sense," as permitted under *Iqbal*, and observed that "[t]ype 2 diabetes is a multifactorial disease" caused by various factors. *Id.* at *3–4. The court found the complaint deficient because "aside from idly listing various common foods [the plaintiff] has eaten," it alleged few facts that could "ultimately show that it was her consumption of these foods," as opposed to other factors, "that led to her disease," *id.*; the Second Circuit affirmed. 594 F. App'x 11 (2d Cir. 2014).

Similarly, in *Pelman*, the plaintiffs alleged that McDonald's marketed addictive products that caused them to develop health conditions, including type 2 diabetes. 237 F. Supp. 2d at 516, 519–20. The district court granted the motion to dismiss, in part because "[n]o reasonable person could find [proximate] cause . . . without resorting to 'wild speculation.'" *Id.* at 538. The court emphasized that, among other shortcomings, "any number of other factors" could potentially have "affected the plaintiffs' weight and health." *Id.*[9]

---

[9] The Second Circuit reversed dismissal of an amended complaint in *Pelman* under pre-*Twombly*/*Iqbal* standards that no longer apply. 396 F.3d 508, 511–12 (2d Cir. 2005). *Twombly*

And again, the *Martinez* court dismissed an almost-identical complaint with prejudice because (in addition to other defects) the plaintiff failed to "plead more than the mere possibility of causation." 2025 WL 2447793, at *2. The court recognized that "idly listing various common [brands]" the plaintiff ate over his lifetime offered nothing "that might lead this Court to believe that [he] could ultimately show that it was [his] consumption of these [brands] . . . that led to [his] disease." *Id.* (quoting *S.F.*, 2014 WL 1600414, at *4) (alterations in original).

As in *S.F.*, *Pelman*, and *Martinez*, the Complaint here is devoid of allegations that plausibly connect any particular product from any specific Defendant to Plaintiff's development of pediatric type 2 diabetes. Even if Defendants' products were capable of causing pediatric type 2 diabetes (and there is no basis for concluding they are), Plaintiff has pleaded no facts that, if true, would establish that her consumption of these products—as opposed to all other relevant factors—caused her alleged health condition. To the contrary, the allegations in the Complaint (which assert that "UPFs" comprise about 73% of the American food supply, Doc. 1 ¶ 354), only confirm that there is no plausible theory of proximate causation for any product or any Defendant.[10]

---

and *Iqbal* support the well-reasoned analysis of the district court in *Pelman*, 237 F. Supp. 2d 512; *accord S.F.*, 2014 WL 1600414, at *4 (relying on the district court's analysis in *Pelman* and noting the Second Circuit's opinion reversing is "open to question" after *Twombly/Iqbal*).

[10] As discussed above, *see supra* Section II(A), that Plaintiff's claims are "related to" obesity under Section 768.37 says nothing about whether she has adequately pleaded proximate cause, s*ee Chevron*, 146 S. Ct. at 1060 ("related to" does not require a causal relationship).

**IV.    Plaintiff's Claims Are Barred By The First Amendment**

Plaintiff's claims are also foreclosed by the First Amendment because they seek to compel Defendants to convey contested scientific and policy judgments about "UPF" through mandated product warnings. *See Cohen v. Cowles Media Co.*, 501 U.S. 663, 668 (1991) ("Our cases teach that the application of state rules of law . . . in a manner alleged to restrict First Amendment freedoms constitutes 'state action' under the Fourteenth Amendment.").

Laws "that restrict, compel, or silence speech are disfavored, and presumptively unconstitutional." *Dana's R.R. Supply v. Att'y Gen., Fla.*, 807 F.3d 1235, 1242 (11th Cir. 2015). Generally, a law compelling commercial speech can be upheld under the First Amendment only if the government has a "substantial interest to be achieved by" the law and shows that "the regulatory technique [is] in proportion to that interest." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 564 (1980). Compelled commercial speech may sometimes be upheld under a lesser standard, but only where the compelled speech is "purely factual and uncontroversial." *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985).

Here, each of Plaintiff's claims is premised in part on her allegation that Defendants failed to "warn" or "disclose" to consumers the alleged effects of their "UPFs." *See, e.g.*, Doc. 1 ¶¶ 597, 704, 711, 730–37, 775, 796, 880. And she seeks a punitive damages award "sufficient to . . . deter similar conduct" and to force disclosures about the alleged health effects of "UPFs" moving forward. *Id.* at 234 ("Prayer for Relief"). The messages Plaintiff seeks to compel—that "UPFs" are

dangerous and carry risks that "other foods do not," *id.* ¶ 733—are neither purely factual nor uncontroversial, so Plaintiff's claims can withstand First Amendment scrutiny only if they satisfy, "*at minimum*," the "intermediate scrutiny" standard under *Central Hudson. See Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 283 (5th Cir. 2024), *aff'd*, 606 U.S. 461 (2025); *see also Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 478–81 (9th Cir. 2022) (forcing companies to make warnings linking acrylamide to cancer would likely be "unconstitutional" given the "scientific debate over whether acrylamide in food causes cancer").

The claims cannot withstand that scrutiny. "[C]ompelling sellers to warn consumers of a potential 'risk' never confirmed by any regulatory body—or of a hazard not 'known' to more than a small subset of the scientific community—does not directly advance" any government interest in public health. *Nat'l Ass'n of Wheat Growers v. Bonta*, 85 F.4th 1263, 1282–83 (9th Cir. 2023) (given "current vigorous debate surrounding the scientific validity of glyphosate's carcinogenicity, forcing Plaintiffs to convey that message" would violate the First Amendment). And there are obviously far less intrusive ways to encourage public discussion and awareness of the speculative risks underlying this lawsuit than mandating the content-based messages Plaintiff suggests should be compelled here. *See* Doc. 1 ¶ 733. In fact, a court has already rejected an ingredient-warning mandate that was *more* tailored than what Plaintiff seeks to impose here—requiring a warning that certain countries do not recommend a contained ingredient—on the ground that such a mandate likely violates the First Amendment. *Am. Beverage Ass'n v. Paxton*, 820 F. Supp. 3d 494, 502 (W.D. Tex. 2026)

33

(observing that "the State could have spoken itself by conducting an advertising campaign but has not done so"), *appeal docketed*, No. 26-50192 (5th Cir. Mar. 10, 2026). This Court should reach the same conclusion.

## V.    Plaintiff's Claims Are Preempted By Federal Law

Because federal law is the "supreme Law of the Land," U.S. Const. art. VI, cl. 2, it expressly preempts state law when "the text of a federal statute explicitly manifests Congress's intent to displace state law," *Carson v. Monsanto Co.*, 72 F.4th 1261, 1266–67 (11th Cir. 2023) (en banc).

Two separate federal regulatory regimes preempt Plaintiff's claims. First, the Federal Meat Inspection Act ("FMIA") and the Poultry Products Inspection Act ("PPIA") preempt any claims that would impose requirements different from or in addition to those imposed under federal law related to the labeling, processing, or inspection of any products containing meat or poultry. Second, the Federal Food, Drug, and Cosmetic Act ("FDCA"), as amended by the Nutrition Labeling and Education Act ("NLEA"), expressly preempts claims that seek to impose non-identical labeling or ingredient requirements. The Complaint's failure to allege which products are actually at issue here prevents a targeted preemption analysis. But the lack of clarity does not insulate the claims from preemption—to the extent the claims intrude into areas governed by federal law, federal law bars them.

### A.    USDA preemption bars claims regarding meat and poultry products

Any claims challenging products containing meat and poultry—like some encompassed by Conagra's Slim Jim brand; Nestlé USA's Hot Pockets brand; and

General Mills' Old El Paso brand, Doc. 1 ¶¶ 653, 663, 683—are expressly preempted by the FMIA and PPIA. These statutes broadly prohibit states from imposing any requirements "with respect to . . . operations" of a meat or poultry product facility or "labeling, packaging, or ingredient requirements" that are "in addition to, or different than," those mandated by federal law. 21 U.S.C. § 678 (FMIA); 21 U.S.C. § 467e (PPIA). These express preemption provisions "sweep[] widely" and "prevent[] a [s]tate from imposing any additional or different—even if nonconflicting—requirements" as to these broad subjects. *Thornton v. Tyson Foods, Inc.*, 28 F.4th 1016, 1024 (10th Cir. 2022) (construing FMIA); *see also Grocery Mfrs. of Am., Inc. v. Gerace*, 755 F.2d 993, 997 (2d Cir. 1985) ("The FMIA and the PPIA . . . contain substantially identical preemption language.").

Federal regulations cover virtually every aspect of meat and poultry production, from inspection of livestock to manufacturing, processing, and labeling. *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 455–56 (2012) (federal law "regulates a broad range of activities" related to meat processing); 21 U.S.C. §§ 603–07 (slaughter); 9 C.F.R. § 424.21(a) (ingredients); FSIS Directive 7120.1, Safe and Suitable Ingredients Used in the Production of Meat, Poultry, and Egg Products (USDA 2026); 9 C.F.R. pts. 318, 381, 424 (preparation and processing); 9 C.F.R. pts. 317, 319, 381, 412 (labeling). For instance, the FMIA permits beef products to be sold only under "labeling and containers which are not false or misleading and which are approved by the Secretary [of Agriculture]." 21 U.S.C. § 607(d). Similarly, the PPIA regulates labels for products that contain poultry. *Id.* § 457.

35

Under this comprehensive regulatory regime, the USDA's Food Safety and Inspection Service ("FSIS") reviews and approves labels to ensure that no meat or poultry products "bear any false or misleading marking, label, or other labeling." 9 C.F.R. § 317.8(a). All meat or poultry product labels—with exceptions not relevant here—must be approved for use by FSIS before entering the marketplace. *See* 9 C.F.R. § 412.1(a). FSIS conveys its approval directly on the product label itself via an official legend or seal that declares the labeling inspected and approved by the USDA. *See* 21 U.S.C. § 606(a):



Had the Complaint actually identified the particular meat or poultry products Plaintiff allegedly consumed, the Court could take judicial notice of the USDA seals. *See Thornton v. Tyson Foods, Inc.*, 482 F. Supp. 3d 1147, 1155, 1157 (D.N.M. 2020).

Any claim that such labels should have included additional information about the purported effects of "UPF" would impermissibly seek to impose a requirement "in addition to, or different than" the labeling mandated by the USDA. *See Thornton*, 28 F.4th at 1024 (FMIA "plainly preempts plaintiffs' labeling claims" because "FSIS has already approved defendants' labels"); *see also Kuenzig v. Hormel Foods Corp.*, 505 F.

App'x 937 (11th Cir. 2013) (per curiam); *Phelps v. Hormel Foods Corp.*, 244 F. Supp. 3d 1312, 1316–18 (S.D. Fla. 2017).

Plaintiff cannot evade the broad preemptive reach of the FMIA and PPIA by recasting her claims as a challenge to ingredients or processing. The USDA's authority "to prescribe 'definitions and standards of identity or composition'" for meat and poultry products necessarily includes "the authority to prescribe their 'ingredients,'" which "is essential to determine the 'identity' of the finished product." *Armour & Co. v. Ball*, 468 F.2d 76, 81 (6th Cir. 1972); *see also Animal Legal Def. Fund Bos. v. Provimi Veal Corp.*, 626 F. Supp. 278, 279, 285–86 (D. Mass. 1986) (claims that a manufacturer should warn that its "veal might be unhealthful because it comes from calves that are fed antibiotics subtherapeutically" are preempted because they would "impose requirements in addition to or different than the federal requirements"). Another court reached this precise conclusion in a case challenging the use of partially hydrogenated soybean oil in gumbo. *See Brower v. Campbell Soup Co.*, 243 F. Supp. 3d 1124, 1128–29 (S.D. Cal. 2017). Plaintiff offers a similar theory here, and her claims challenging the ingredients, processing, and labeling of any USDA-regulated (meat and poultry) products are expressly preempted. 21 U.S.C. §§ 467e, 678.

## B. Plaintiff's vague pleading improperly attempts to evade FDA preemption

The remainder of Plaintiff's claims may also be preempted, although Plaintiff's vague pleading frustrates that analysis. Congress vested the FDA with regulatory authority over food products other than meat and poultry and tasked it with

"promot[ing] the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products." 21 U.S.C. § 393(b)(1). The FDA regulates food safety, including by regulating food ingredients and labels under the FDCA, as amended by the NLEA. To effectuate that purpose, the NLEA creates a nationwide labeling system, and broadly and expressly preempts state-law obligations "not identical" to various federal requirements. 21 U.S.C. § 343-1.

Here, it is unclear what requirements are at issue because the Complaint does not identify specific products, much less specify what Defendants should have done differently with respect to the labeling, warnings, ingredients, or manufacturing regarding any such product. Regardless, there is good reason to conclude that at least some of Plaintiff's claims are preempted.

For example, federal law precludes any challenge with respect to the labeling or formulation of products that are subject to a federal standard of identity, such as yogurt (21 C.F.R. § 131.200) or pancake syrup (*id.* § 168.180). *See Mills v. Giant of Md., LLC*, 441 F. Supp. 2d 104, 108 (D.D.C. 2006) ("The court rejects the contention that a label with either of the warnings suggested by plaintiffs is 'identical' to a label without these warnings."), *aff'd on other grounds*, 508 F.3d 11 (D.C. Cir. 2007). Also preempted are any claims that Defendants should have included different or additional disclosures with respect to specific ingredients that are already covered by FDA labeling requirements, such as hydrogenated oils (21 C.F.R. § 101.4(b)(14)) or artificial flavoring, coloring, or preservatives (21 C.F.R. § 101.22). *See Turek v. General Mills,*

38

*Inc.*, 662 F.3d 423, 427 (7th Cir. 2011). The same goes for ingredients that federal law recognizes as generally safe. *See* 21 C.F.R. § 184.1444 (maltodextrin); *id.* § 184.1857 (dextrose); *id.* § 184.1859 (invert sugar).

Even in their highly generalized form, Plaintiff's claims seek to impose requirements that are inconsistent with the FDCA and NLEA and should therefore be dismissed. Plaintiff should not be allowed to evade the expansive reach of the NLEA's express preemption provision through vague and imprecise pleading. For this reason, too, the claims should be dismissed.

## VI. Each Of Plaintiff's Claims Fails For Additional Reasons

The various issues identified above are dispositive of Plaintiff's claims, and the Complaint should be dismissed without further consideration of the merits. But Plaintiff's claims also fail for additional, independent reasons specific to each count.

### A. Plaintiff fails to adequately allege negligence and strict liability (Counts I–III)

Plaintiff alleges claims for failure-to-warn (Counts I and II) and design defect (Counts I and III), under both negligence and strict liability theories. All iterations of Plaintiff's claims fail.

#### 1. The failure-to-warn claims (Counts I and II) fail because Plaintiff has not adequately pleaded duty or warning causation

To state a claim for negligent failure to warn under Florida law, a plaintiff must plausibly allege that (1) the defendant "had a duty to warn [the plaintiff] of foreseeable risks," (2) the defendant "breached that duty by inadequate warning," (3) "the breach caused [the plaintiff's] injury," and (4) the plaintiff "suffered damages." *Suzuki Motor*

39

*Corp. v. Winckler*, No. 24-1959, 2026 WL 969574, at *5 (Fla. 5th DCA Apr. 10, 2026);

*see also Ganz v. Grifols Therapeutics LLC*, 688 F. Supp. 3d 1209, 1226 (S.D. Fla. 2023).

Similarly, "[t]o state a strict liability failure to warn claim, the plaintiff must plead that

the defendant did not adequately warn of a particular risk that was known or knowable

in light of the generally recognized and prevailing scientific and medical knowledge

available at the time of manufacture and distribution." *Tsavaris v. Pfizer, Inc.*, No. 15-

21826, 2016 WL 375008, at *3 (S.D. Fla. Feb. 1, 2016). "[M]anufacturers are not

required to warn of every risk which might be remotely suggested by any obscure tidbit

of available knowledge." *Ferayorni v. Hyundai Motor Co.*, 711 So. 2d 1167, 1172 (Fla.

4th DCA 1998).

    ***No duty to warn.*** Plaintiff has not adequately alleged that Defendants owed her

any cognizable duty to warn, much less that Defendants breached any supposed duty.

A duty to warn arises only "where a product is inherently dangerous" or has "known

dangers which are not otherwise fully appreciated by the user." *Byrnes v. Honda Motor

Co.*, 887 F. Supp. 279, 280–81 (S.D. Fla. 1994). "The obviousness of danger and

adequacy of warning are determined by a 'reasonable person' standard." *Marzullo v.

Crosman Corp.*, 289 F. Supp. 2d 1337, 1345–46 (M.D. Fla. 2003).

    Plaintiff claims that Defendants should have warned her that "regularly,

frequently, and chronically ingest[ing]" Defendants' products could lead to the

development of pediatric type 2 diabetes. Doc. 1 ¶¶ 592, 597. But courts applying

Florida law have repeatedly held that the possibility that excessive consumption of any

food or drink may have adverse health consequences is precisely the kind of risk about

40

which manufacturers have no duty to warn. *See, e.g.*, *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 324 (S.D.N.Y. 2006) (dismissing failure-to-warn claim under Florida law because "[t]he average consumer surely anticipates that a high-fat, high-protein diet would increase both cholesterol levels and the risk of heart disease") (citing Restatement (Second) of Torts § 402A cmt. i), *aff'd*, 279 F. App'x 40 (2d Cir. 2008). Another court applying Florida law recognized that products "intended for human consumption are not unreasonably dangerous—and thus are not defective without warnings—even though they may, over a period of time, cause harm which results from commonly-appreciated risks associated with those products." *Victory Over Addiction Int'l, Inc. v. Am. Brands, Inc.*, No. 97-14489, 1998 WL 35427606, at *2 (S.D. Fla. Feb. 6, 1998).

These courts have aligned with the longstanding view, set forth in the Restatement, that "any food or drug necessarily involves some risk of harm, if only from over-consumption," but that does not mean all foods and drugs must bear a warning to that effect. Restatement (Second) of Torts § 402A cmt. i. To illustrate, "[g]ood butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous." *Id.*

Here, Plaintiff's failure-to-warn theory is based entirely on the alleged long-term health effects of overconsuming many of Defendants' products, many times a week, for many years straight. Doc. 1 ¶¶ 711, 731. Plaintiff does not allege any product was contaminated or spoiled—her theory is based entirely on the sheer volume of products

she consumed over time. She alleges, for example, that she developed pediatric type 2 diabetes after purportedly consuming:

- At least 18 types of cereal 64 times a week for 6 years;

- At least 9 types of beverages 33 times a week for 4 years;

- At least 5 types of candy 22 times a week for over a decade;

- Hot Pockets, Bagel Bites, Stove Top products, macaroni and cheese, and hot dogs a combined 28 times a week for at least 7 years;

- On top of that, dozens of other foods and beverages just from these eleven Defendants many times a week. Doc. 1 ¶¶ 603, 613, 623, 633, 643, 653, 663, 673, 683, 693.

Accepting those allegations as true—and even without accounting for all of the other foods and beverages *not* made by Defendants that Plaintiff presumably consumed—it is apparent that Plaintiff's claims arise from her long-term consumption of a large volume of foods and beverages, including Defendants' products, not from any contamination or other defect that rendered the products unsafe.

Plaintiff's allegations that "UPFs" are addictive do not alter this outcome. For starters, Plaintiff does not allege that *she* was ever addicted to any of Defendants' products. But in any event, an allegation that a food or beverage is addictive is insufficient to save an otherwise deficient claim. *See Bruner v. Anheuser-Busch, Inc.*, 153 F. Supp. 2d 1358, 1359–60 (S.D. Fla. 2001) (dismissing claim that consumers were "lured to and consumed large quantities" of beer and misled by advertising that it "was safe, to consume[,] and was not addictive"), *aff'd*, 31 F. App'x 932 (11th Cir. 2002); *Garrison v. Heublein, Inc.*, 673 F.2d 189, 189 n.2, 190–91 (7th Cir. 1982) (affirming

42

dismissal of complaint alleging that plaintiffs suffered injuries after 20 years of vodka consumption and that vodka has propensities "to be addictive"); *Pelman*, 237 F. Supp. 2d at 542 ("overly vague" allegation that defendant failed to warn that food is "addictive" cannot "survive dismissal").

*No warning causation*. Even if Defendants had a duty to warn, Plaintiff has failed to plausibly allege that any failure to warn caused her alleged injuries. *See, e.g.*, *Jimenez*, 2023 WL 4251176, at *2–3 (dismissing strict-liability failure-to-warn claim where complaint "did not include any allegation that she read the label"). Plaintiff asserts in a conclusory manner that "[h]ad Plaintiff known of any of the dangers of the UPF of each Defendant . . . Plaintiff would not have started ingesting and/or using their UPF." Doc. 1 ¶ 716. But this statement merely restates the element of the cause of action and is plainly insufficient under *Iqbal*. 556 U.S. at 678.

This allegation is also implausible. The Complaint acknowledges that consumers have access to ingredient lists—meaning that Plaintiff started and maintained her alleged consumption habits for over a decade even with required nutritional labeling. Doc. 1 ¶ 110. The only commonsense reading of these allegations is that any purported failure to warn could **not** have proximately caused Plaintiff's injuries. *See Lopez v. S. Coatings, Inc.*, 580 So. 2d 864, 865 (Fla. 3d DCA 1991) (per curiam) ("Where the person to whom the manufacturer owed a duty to warn . . . has not read the label, an inadequate warning cannot be the proximate cause of the plaintiff's injuries.").

> **2.    Plaintiff's design-defect claims (Counts I and III) fail because she does not identify what was defective about any specific food or beverage**

Whether a design-defect claim sounds in negligence or strict liability, the plaintiff has the burden of establishing: "(1) that a defect was present in the product; (2) that it caused the injuries complained of; and (3) that it existed at the time the retailer or supplier parted possession with the product." *Cassisi*, 396 So. 2d at 1143. Plaintiff must therefore plausibly allege that "the product was defective or unreasonably dangerous." *See Marzullo*, 289 F. Supp. 2d at 1342, 1347 (applying this standard to claims sounding in both negligence and strict liability). Courts have rejected design-defect claims where the complaint does "not allege that the [product at issue] failed to perform the function for which it was designed," or "that an alternative design would have enabled" the product to perform equally "in a safer manner." *Id.* at 1342–43, 1347; *see also, e.g.*, *Witt v. Howmedica Osteonics Corp.*, No. 13-20742, 2013 WL 6858395, at *2 (S.D. Fla. Dec. 30, 2013) (dismissing strict-liability claim because allegations about what was defective in a product were "vague and overbroad"); *Gomez*, 675 F. Supp. 2d at 1163 (dismissing strict liability claims in part because there were "no factual allegations suggesting what was in fact defective about the products"); *Rice v. Walker*, 359 So. 2d 891, 892 (Fla. 3d DCA 1978) (per curiam) (dismissing product liability claim where plaintiff did not allege how the product's components "were defective or dangerous to the user, or how they reasonably could or should have been made safe").

Plaintiff has alleged neither. She has not identified the specific products being challenged, or what (if anything) was defective or dangerous about the design of each. If Plaintiff meant to allege that the defect is that these foods and beverages are purportedly "UPFs," that is plainly insufficient. Plaintiff is unable to even provide a consistent definition of UPF, at times pointing to different processes, ingredients, and additives. *See supra* Section III. And Plaintiff does not explain what is *defective* about any of those processes, ingredients, or additives. Plaintiff also does not allege whether (and, if so, how) any of the foods or beverages encompassed by her list of brands could have been made in a "safer" manner. The Complaint recognizes that "UPFs" are relatively "low cost" and have "long shelf-li[ves]," Doc. 1 ¶¶ 111, 292, but Plaintiff does not even assert that alternative non-"UPF" products would have those same features.

There is no duty to "design a product which is totally incapable of injuring those who foreseeably come in contact with the product." *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 19 (Fla. 4th DCA 2022). Products of every brand named in the Complaint are safely consumed by consumers every day, and Plaintiff does not allege any facts suggesting any particular defect in any food or beverage caused her harm. Accordingly, her negligent and strict-liability design-defect claims fail.[11]

---

[11] Although Paragraph 711 of the Complaint vaguely alleges that Defendants breached an unspecified duty related to their "manufacturing" of the products, "[m]anufacturing defects are generally limited to situations where something goes wrong in the manufacturing process." *Salinero v. Johnson & Johnson*, 400 F. Supp. 3d 1334, 1344 (S.D. Fla. 2019), *aff'd*, 995

### B.    Plaintiff fails to plead any breach of an implied warranty of fitness for a particular purpose (Count IV)

Plaintiff's claim for breach of the implied warranty of fitness for a particular purpose fails for at least three reasons.

*First*, Plaintiff has not complied with Florida's pre-suit notice requirement, which obligates a buyer to notify the seller "within a reasonable time after . . . she discovers or should have discovered any breach." Fla. Stat. § 672.607(3)(a); *see Chapman*, 930 F. Supp. 2d at 1325 (notice requirement applies to implied warranty of fitness for a particular purpose claim). Failure to do so "bar[s] [her] from any remedy." Fla. Stat. § 672.607(3)(a). Here, Plaintiff has failed to plead that she gave adequate notice of any alleged breach prior to filing this lawsuit—much less "within a reasonable time" after discovering an alleged breach—which forecloses her claim. *Fineman v. Ferragamo USA Inc.*, 672 F. Supp. 3d 1302, 1307 (S.D. Fla. 2023) (dismissing implied warranty claim where plaintiff did not provide pre-suit notice).

*Second*, Plaintiff does not allege privity with any Defendant. "Florida law requires privity of contract to sustain a breach of implied warranty claim." *David v. Am. Suzuki Motor Corp.*, 629 F. Supp. 2d 1309, 1321 (S.D. Fla. 2009). Plaintiff does not and cannot allege any such privity with any of Defendants, who are food and beverage manufacturers, not retailers. *See Bailey v. Monaco Coach Corp.*, 168 F. App'x 893, 894

---

F.3d 959 (11th Cir. 2021). Plaintiff does not allege any manufacturing error that caused any of Defendants' products to deviate from their design.

n.1 (11th Cir. 2006) (per curiam) (implied-warranty claim fails for lack of privity where plaintiff bought the product from a store instead of directly from a manufacturer).

*Third*, Plaintiff has failed to allege that any Defendant had "reason to know of a particular purpose for which the goods are required" or that she "relie[d] on the seller's skill or judgment to select or furnish suitable goods." *Royal Typewriter Co. v. Xerographic Supplies Corp.*, 719 F.2d 1092, 1100 (11th Cir. 1983) (citing Fla. Stat. § 672.315). For this claim, a "particular purpose" "envisages a specific use by the buyer which is peculiar to the nature of [the buyer's] business." *Id.* For example, "shoes are generally used for the purpose of walking upon ordinary ground, but a seller may know that a particular pair was selected to be used for climbing mountains." *Sweeney*, 2015 WL 5446797, at *5. Here, Plaintiff does not allege that she used Defendants' products for any peculiar or particular purpose, much less that she relied upon Defendants' judgment to select the products for a specific purpose. She therefore cannot state a claim for breach of implied warranty.

### C.    All fraud and deception-based claims fail for multiple reasons (Counts V–VII)

Plaintiff has asserted three claims based on alleged misrepresentations and deceptive conduct: negligent misrepresentation (Count V), fraudulent concealment (Count VI), and false advertising under the Florida False Advertising Statute (Count VII). These claims are subject to the heightened pleading standard of Rule 9(b). *See Linville*, 697 F. Supp. 2d at 1306 (negligent misrepresentation); *Koski v. Carrier Corp.*, 347 F. Supp. 3d 1185, 1196–97 (S.D. Fla. 2017) (fraudulent concealment); *Volinsky*,

47

2024 WL 1299315, at *6 (false advertising). Plaintiff has not adequately pleaded her fraud-based claims under any standard, let alone with particularity.

### 1. Plaintiff has not adequately alleged any false statement or reliance

Plaintiff's fraud and deception claims require her to allege both misrepresentation and reliance with particularity. *See Koski*, 347 F. Supp. 3d at 1196–97 (fraudulent concealment); *Cramer v. Palm Ave. Partners, LLC*, 672 B.R. 517, 537 (M.D. Fla. 2025) (negligent misrepresentation); *Piescik v. CVS Pharmacy, Inc.*, 576 F. Supp. 3d 1125, 1134 (S.D. Fla. 2021) (false advertising). Plaintiff has not done so.

*First,* Plaintiff does not identify any misrepresentation made by any Defendant. Plaintiff must allege the "time, place, and substance of the defendant's alleged fraud," including "the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them." *Chapman*, 930 F. Supp. 2d at 1324–25. But Plaintiff does not point to a single specific label, commercial, advertisement, or other statement alleged to be false. Instead, most of her allegations of fraud are generalized, boilerplate assertions—such as that Defendants "misrepresent[ed] that their respective UPFs were safe for human consumption," Doc. 1 ¶ 778 (negligent misrepresentation), "concealed that they had not adequately researched or tested their UPF," *id.* ¶ 794 (fraudulent concealment), or "misle[d] consumers by omitting, understating, or downplaying risks associated with use of their UPF," *id.* ¶ 822 (false advertising).

Those broad claims, untethered to any actual advertisement or statement, fail to "identif[y] what the misrepresentations were, when they were made, how they were

made, where they were made, [and] who made them." *Rowe v. Mentor Worldwide, LLC*, 297 F. Supp. 3d 1288, 1296–97 (M.D. Fla. 2018) (granting motion to dismiss where plaintiff did not identify the alleged misrepresentation with particularity); *see Volinsky*, 2024 WL 1299315, at *6–8 (dismissing fraud-based claims where plaintiff pointed to some representations by defendant, but did not identify the specific messages that were allegedly false or "where and when [plaintiff] viewed any alleged misrepresentation"); *Elders v. United Methodist Church*, 793 So. 2d 1038, 1042 (Fla. 3d DCA 2001) (dismissing fraudulent misrepresentation claim where plaintiff alleged no "specific statement made by [defendant] to the plaintiffs" that included false information); *Holguin v. Celebrity Cruises, Inc.*, No. 10-20215, 2010 WL 1837808, at *2 (S.D. Fla. May 4, 2010) (dismissing negligent misrepresentation claim for failure to adequately identify misrepresentations).

In the few instances where the Complaint discusses specific marketing efforts by some (but not all) Defendants, Plaintiff does not specify what (if anything) was false or misleading about the advertisements. For example, Plaintiff references YouTube videos that involved OREO cookies and Super Mario characters, Kraft Mac & Cheese products and PAW Patrol characters, and Minions holding bags of Cheetos products, all to assert that some Defendants "target[ed] children with UPF marketing." Doc. 1 ¶¶ 323–24, 339. But Plaintiff does not assert that anything in those ads was *false* or *deceptive*. *See Douse v. Bos. Sci. Corp.*, 314 F. Supp. 3d 1251, 1262 (M.D. Fla. 2018) (dismissing claim for fraudulent misrepresentation because the complaint did "not detail why [the] statement [was] false, or what relevance it [had] to the [product's]

49

safety and efficacy"). And the fact that ads were allegedly geared toward children does not render those advertisements deceptive. *Cf. Austin's Nat. Frozen Pops, Inc. v. Jonny Pops, LLC*, 809 F. Supp. 3d 476, 486 (W.D. Tex. 2025) (dismissing false advertising claim under Lanham Act where alleged advertisements about high-sugar products being healthy for children were not "tied in any way to images of children in its advertising"). Nor does Plaintiff "allege the particular time and place that [any] omission occurred." *Volinsky*, 2024 WL 1299315, at *7. Thus, Plaintiff has not adequately identified any misrepresentation.

*Second*, Plaintiff does not allege that she justifiably relied on any statement by any Defendant. Again, she does not allege that she even *saw* a single advertisement identified in the Complaint, much less relied on any particular advertisement before consuming Defendants' foods and beverages. Nor does Plaintiff say anything about which advertisements her parents or other adults involved in purchasing food for her saw or relied on. And while Plaintiff alleges she "justifiably relied on each Defendants' respective misrepresentations and nondisclosures to their detriment," Doc. 1 ¶¶ 781, 802, this type of "bare allegation of reliance on alleged misrepresentations, bereft of any additional detail, will not suffice under Rule 9(b)," *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1128 (11th Cir. 2019) (dismissing due to plaintiff's failure to allege reliance with particularity); *McGee v. JP Morgan Chase Bank, NA*, 520 F. App'x 829, 832 (11th Cir. 2013) (per curiam) (same). Moreover, in some instances, the brands in the identified advertisements (like Doritos, Cheetos, Lunchables, and Kid Cuisine, Doc. 1 ¶¶ 323, 339, 343) do not even match the brands Plaintiff allegedly consumed or aired

50

after her January 2022 diagnosis, rendering any conclusory assertion of reliance wholly implausible. *See id*. ¶¶ 324, 342, 344–45.

### 2. Plaintiff cannot state an omission claim under the Florida False Advertising Statute (Count VII)

Plaintiff's claim under the Florida False Advertising Statute fails for the additional reason that an alleged misrepresentation by omission is outside the scope of the statute. Plaintiff alleges that Defendants' unspecified advertisements violated the statute because they "*[f]ail[ed] to disclose* the safety risks associated with their UPF,*" "misl[]ed consumers by *omitting . . .* risks associated with use of their UPF," and "*concealed* and *did not disclose*" material information. Doc. 1 ¶¶ 820(c), 822–23 (emphases added). But *omissions* are not actionable under the Florida False Advertising Statute. The statute specifically covers "any statement" that qualifies as misleading advertising, but it nowhere refers to omissions. Fla. Stat. § 817.41. "If the Florida Legislature had intended that liability for false advertising under [S]ection 817.41 encompass misrepresentations by omission, it could have so stated, as it has done in the context of false advertising in the insurance industry. But it did not[.]" *Robinson v. 3M Co.*, No. 24-828, 2025 WL 2061706, at *19 (M.D. Fla. July 23, 2025) (holding "Section 817.41 forecloses" theories of misleading advertisement based on omissions).

### 3. Plaintiff's fraudulent concealment claim further fails for lack of a duty to disclose (Count VI)

Plaintiff's fraudulent concealment claim also fails for lack of any duty. "Allegations of fraudulent concealment by silence must be accompanied by allegations of a special relationship that gives rise to a duty to speak." *Greenberg v. Miami Children's*

51

*Hosp. Rsch. Inst., Inc.*, 264 F. Supp. 2d 1064, 1073–74 (S.D. Fla. 2003). Plaintiff alleges "no confidential, contractual, or fiduciary relationship" between herself and Defendants. *TransPetrol, Ltd. v. Radulovic*, 764 So. 2d 878, 879–80 (Fla. 4th DCA 2000). At most, Plaintiff suggests an arm's-length commercial transaction—via several intermediary distributors and retailers—but that is insufficient to trigger a duty to disclose under Florida law. *Broward Motorsports of Palm Beach, LLC v. Polaris Sales, Inc.*, No. 17-811, 2018 WL 1072211, at *5 (S.D. Fla. Feb. 27, 2018) (dismissing fraudulent concealment claim due to lack of duty to disclose); *Hummel v. Tamko Bldg. Prods., Inc.*, No. 15-910, 2015 WL 12843907, at *4–5 (M.D. Fla. Nov. 6, 2015) (same).

### D.    Plaintiff's conspiracy (Count VIII) and concerted action (Count IX) claims also fail for multiple reasons

Plaintiff's claims for conspiracy and concerted action against six of the Defendants—Kraft Heinz, Mondelēz International, Post Holdings, Coca-Cola, General Mills, and Mars—are just as deficient as her other claims. "Florida does not recognize [concert of action] theories of liability" in product liability actions. *Ray v. Cutter Lab'ys, Div. of Miles, Inc.*, 754 F. Supp. 193, 195 (M.D. Fla. 1991); *see also Rey v. Philip Morris, Inc.*, 75 So. 3d 378, 382 (Fla. 3d DCA 2011) (discussing "Supreme Court of Florida's rejection of the 'concert of action' theory of liability" in a product liability action). Count IX should be dismissed because "[i]t is not the function of federal courts to expand state tort doctrine in novel directions." *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1154 (11th Cir. 2011).

52

To survive a motion to dismiss a conspiracy claim, a plaintiff must allege both underlying tortious activity and an agreement to act unlawfully. *See Samara v. Juice Plus+ Co., LLC*, No. 20-520, 2021 WL 8894301, at *3 (M.D. Fla. Mar. 1, 2021) (dismissing claim for failure to adequately plead these essential elements). When the underlying allegations sound in fraud, these elements must be pled "with specificity." *Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1067–68 (11th Cir. 2007) (affirming dismissal of conspiracy claims grounded in "conclusory" allegations of fraud). Plaintiff has not alleged these essential elements under Rule 8, much less Rule 9(b).

### 1.    Plaintiff has not alleged an underlying tort

A claim for civil conspiracy cannot survive without an "underlying illegal act or tort on which conspiracy is based." *Alhassid v. Bank of Am., N.A.*, 60 F. Supp. 3d 1302, 1316 (S.D. Fla. 2014) ("[B]ecause Plaintiffs' breach of contract and statutory violation claims . . . do not survive . . . they cannot substantiate Plaintiffs' civil conspiracy claim."). Here, there is no "underlying tort" for all the reasons previously discussed. In particular, Plaintiff's lawsuit is barred by Section 768.37; she has failed to tie any product manufactured by any Defendant to her alleged injuries; she has not pleaded that any Defendant's products were defective; and she has not identified any fraudulent conduct. These pleading deficiencies require dismissal of Plaintiff's conspiracy claim.

### 2. Plaintiff does not plausibly allege an agreement to accomplish an unlawful result

Plaintiff also fails to plausibly allege the most basic element of a conspiracy: an agreement. *See Samara*, 2021 WL 8894301, at *3. "[C]onclusory allegations of agreement are insufficient . . . ." *Mika v. Rollins Coll.*, No. 25-111, 2026 WL 679128, at *12 (M.D. Fla. Mar. 11, 2026) (Sneed, J.) (dismissing civil conspiracy claim "[g]iven the nondescript nature of" alleged agreement); *Pierson v. Orlando Reg'l Healthcare Sys.*, No. 8-466, 2010 WL 1408391, at *23–26 (M.D. Fla. Apr. 6, 2010) (rejecting "conclusory" and "speculative" allegations of an agreement), *aff'd*, 451 F. App'x 862 (11th Cir. 2012). Moreover, to satisfy Rule 8's plausibility requirement, a plaintiff must plead more than "parallel conduct" that could just as well be independent action. *Tristar Prods., Inc. v. Telebrands Corp.*, No. 24-238, 2025 WL 1111513, at *21 (N.D. Fla. Apr. 14, 2025) (the "allegations sum up to independent, parallel conduct by Telebrands and Perch that Tristar tries to gloss over with naked assertions of a conspiracy"). Even knowingly similar or interdependent action is insufficient on its own. *Almanza v. United Airlines, Inc.*, 851 F.3d 1060, 1068–69 (11th Cir. 2017) ("conscious parallelism and interdependence" is insufficient).

Plaintiff's conspiracy allegations do not satisfy these requirements because they are directed at "the UPF industry" writ large. *See, e.g.*, Doc. 1 ¶ 552. Plaintiff does not identify the members, specify when they joined the alleged conspiracy, or delineate their alleged "role in the supposed conspiracy." *Mika*, 2026 WL 679128, at *12; *see Pierson*, 2010 WL 1408391, at *23 (a claim for civil conspiracy should allege "the scope

54

of the conspiracy, its participants, and when the agreement was entered into"). Additionally, despite asserting that the "conspiracy has been in existence for at least 25 years," *see* Doc. 1 ¶ 851, Plaintiff does not describe the content of any unlawful communications between its members or point to any intentional collaboration among its members. *See Safeguard Support Servs., LLC v. Nationwide Referral Servs., LLC*, No. 11-61977, 2011 WL 13217971, at *10 (S.D. Fla. Dec. 15, 2011) (dismissing conspiracy claim because plaintiff did not allege any facts showing that defendants communicated with each other for an illicit purpose).

Instead, Plaintiff generically alleges that "UPF companies" spent money lobbying or sponsoring scientific research. *See, e.g.*, Doc. 1 ¶ 556 (political lobbying), ¶ 563 (scientific research). Putting aside the fact that lobbying activity is protected by the First Amendment, *TEC Cogeneration Inc. v. Fla. Power & Light Co.*, 76 F.3d 1560, 1573 (11th Cir. 1996), Plaintiff alleges nothing to suggest that any alleged conspirator agreed with another to engage in this protected conduct, *see WGI Inc. v. Mayfield*, No. 24-81071, 2025 WL 1191201 (S.D. Fla. Mar. 27, 2025) (dismissing civil conspiracy claim where parallel conduct did not support a reasonable inference of conspiracy).

The closest Plaintiff comes to pleading an agreement is claiming that some executives once "sat together in the same room" and "were told" of one individual's belief that food companies were responsible for certain public health consequences, including increased childhood obesity. Doc. 1 ¶¶ 582–83. Even if that were true, Plaintiff expressly acknowledges that "the presentation was a failure" and "[n]othing was done"—*i.e.*, the meeting did not lead to any agreement among the attendees. *Id.*

55

¶ 552. In other words, Plaintiff does not even suggest (much less plausibly plead) that the meeting resulted in any of the attendees' companies developing, marketing, or selling products in different fashion. Simply put, the lynchpin of Plaintiff's conspiracy theory—a 1999 meeting—forecloses the notion of any agreement. *Cf. Almanza*, 851 F.3d at 1073 (allegations that defendants were "in the same room on multiple occasions and that they did the same thing in response to the same stimulus" showed "nothing more than parallel conduct").

Finally, even if an agreement could be inferred from the occurrence of one meeting nearly three decades ago, Plaintiff does not plausibly allege that the specific purpose of it was "***to do an unlawful act or to do a lawful act by unlawful means.***" *Tristar Prods.*, 2025 WL 1111513, at *20 (emphasis added). To the contrary, Plaintiff explicitly pleads that the six Defendants acted "to advance their financial interests," Doc. 1 ¶ 842, and secure a share of the food market, *id.* ¶ 850; *see also, e.g., id.* ¶ 16 ("formulation strategies were quickly adopted throughout the UPF industry, with the goal of driving consumption, and Defendants' profits"); *id.* ¶¶ 532–87 (similar allegations). These allegations only confirm that the alleged conspiratorial acts that Plaintiff attributes to the six Defendants are "not only compatible with," but are indeed "more likely explained by, lawful, unchoreographed free-market behavior." *Tristar Prods.*, 2025 WL 1111513, at *21; *see also Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1294 (11th Cir. 2010); *Pierson*, 2010 WL 1408391, at *27 (dismissing civil conspiracy claim where plaintiffs recited "discrete actions of individual Defendants" combined with a "bald[]" assertion of conspiracy).

In short, Plaintiff has, at most, vaguely described competitors' participation in the ever-evolving food market, which falls short of pleading any meeting of the minds, let alone an agreement to commit a tortious act.

## VII.   The Court Should Dismiss All Of Plaintiff's Claims Against Mondelēz International And Post Holdings For Lack Of Personal Jurisdiction

The Court should separately dismiss Defendants Mondelēz International and Post Holdings under Rule 12(b)(2) for lack of personal jurisdiction. The Due Process Clause of the Fourteenth Amendment permits the exercise of personal jurisdiction over a nonresident defendant only when it has purposefully availed itself of the benefits and protections of the forum state by establishing minimum contacts with that state. *Herederos De Roberto Gomez Cabrera, LLC v. Teck Res. Ltd.*, 43 F.4th 1303, 1310–12 (11th Cir. 2022) (finding no personal jurisdiction over parent company based on local activities of "legally distinct" subsidiary). Personal jurisdiction may be general or specific. *Id.* at 1310. Mondelēz International and Post Holdings are not subject to either form of jurisdiction.

*First*, Mondelēz International and Post Holdings are not subject to general jurisdiction in Florida under the exacting standards set forth in *Daimler*, 571 U.S. 117, because they are not "at home" here. *RG Golf Warehouse, Inc. v. Golf Warehouse, Inc.*, 362 F. Supp. 3d 1226, 1234 (M.D. Fla. 2019) (to satisfy the "stringent" due process requirements of general jurisdiction, "a defendant's 'affiliations with the State [must] be so continuous and systematic as to render it essentially at home in the forum State'"). For a corporation, the "paradigm" forums for general jurisdiction are the

57

corporation's state of incorporation and its principal place of business. *See Daimler*, 571 U.S. at 137. Here, Mondelēz International is incorporated in Virginia, and its principal place of business is in Chicago, Illinois. Decl. of J. East ("East Decl.") ¶ 5 (attached as Ex. 2). Post Holdings is incorporated in Missouri, and its principal place of business is in Missouri. *See* Decl. of D. Gray ("Gray Decl.") ¶ 5 (attached as Ex. 3). These Defendants are therefore not subject to general jurisdiction in Florida.

*Second*, Mondelēz International and Post Holdings are also not subject to specific jurisdiction in this Court. The touchstone of specific jurisdiction is that the claims "arise[] out of or relate[] to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Superior Court*, 582 U.S. 255, 262, 265 (2017). Although the Complaint alleges that both Mondelēz International and Post Holdings have "derived substantial revenue from goods and products sold and/or used in the State of Florida," Doc. 1 ¶¶ 53–54, 59–60, both of these Defendants are mere holding companies that do not even transact any business in Florida. *See* East Decl. ¶ 6; Gray Decl. ¶¶ 6–7. Nor did either Defendant develop, manufacture, test, market, or sell any of the products or brands named in Plaintiff's Complaint.[12] *See* East Decl. ¶¶ 6–9; Gray Decl. ¶¶ 7, 9–10. As a result, they have not "purposefully availed" themselves of Florida's laws, let alone

---

[12] Mondelēz International is the parent company of Mondelēz, which has developed, manufactured, marketed, and sold food and beverage products in the United States, including for brands named in Plaintiff's Complaint. East Decl. ¶ 11; Doc. 1 ¶ 613. Post Holdings is a consumer-packaged goods holding company. One of the companies that Post Holdings holds is Post Consumer Brands. Gray Decl. ¶ 8. Post Consumer Brands is the entity responsible for the design, manufacture, labeling, marketing, and sale of the Honey-Comb® brand cereal that Plaintiff allegedly consumed. *Id.* ¶¶ 9–10; Doc. 1 ¶ 623.

in a way that gave rise to or relates to Plaintiff's claims. *Goldstein v. Johnson & Johnson*, No. 18-20341, 2019 WL 289290, at *3 (S.D. Fla. Jan. 21, 2019) (dismissing claims against a "mere holding company" that did not design, manufacture, or sell the drug at issue and was therefore not subject to specific jurisdiction in Florida).[13]

The fact that Mondelēz International and Post Holdings are the parent companies of subsidiaries that did manufacture and sell products allegedly consumed by Plaintiff does not support a different conclusion. "[A] foreign parent corporation is not subject to the jurisdiction of a forum state merely because its subsidiary is present or doing business there." *MSP Recovery Claims, Series LLC v. Caring Voice Coal., Inc.*, 722 F. Supp. 3d 1296, 1309–10 (S.D. Fla. 2024). "It is well established that as long as a parent and a subsidiary are separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other." *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1293 (11th Cir. 2000); *see also MSP Recovery*, 722 F. Supp. 3d at 1309–11 (dismissing holding company that did not exercise "day-to-day control over the internal affairs or basic operations" of subsidiaries). Here, the Complaint does not even attempt to allege any lack of corporate separateness. *See Bryant v. Hasbro, Inc.*, No. 18-1336, 2020 WL 224513, at *3 (M.D. Fla. Jan. 15, 2020) (dismissing parent company where "[n]one of the allegations . . . suggest that [it] controlled its subsidiaries").

---

[13] This evidence similarly precludes satisfaction of Florida's long-arm statute, Fla. Stat. § 48.193. *See Almond v. Coloplast A/S*, No. 20-731, 2021 WL 2042659, at *5 (M.D. Fla. May 21, 2021) (requirements of long-arm statute not satisfied where foreign business did not manufacture or sell the purportedly defective product anywhere, let alone in Florida).

Moreover, the evidence submitted by Mondelēz International and Post Holdings demonstrates that they and their subsidiaries "maintained a separate 'semblance of identity.'" *Dawson v. Generac Power Sys., Inc.*, 820 F. Supp. 3d 1306, 1322–23 (M.D. Fla. 2025) (holding company not subject to personal jurisdiction where declaration showed that it does not exert operational control over the internal day-to-day affairs of subsidiary). For example, Post Holdings does not direct or control the daily operations of Post Consumer Brands, and both companies maintain separate and distinct executive leadership teams. Gray Decl. ¶¶ 13–18. Similarly, Mondelēz International does not direct or control the daily operations of Mondelēz, and both companies maintain separate and distinct boards of directors. East Decl. ¶¶ 13–16.

For all of these reasons, the Court should separately dismiss all claims against Mondelēz International and Post Holdings for lack of personal jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint in its entirety with prejudice.

## LOCAL RULE 3.01(g) CERTIFICATION

Pursuant to M.D. Fla. Local Rule 3.01(g), on June 10, 2026, counsel for the Defendants conferred with counsel for Plaintiff by Zoom in a good faith effort to resolve the issues raised in this motion and certify that Plaintiff opposes the relief requested.

Dated: June 17, 2026

Respectfully submitted,

s/ *Michael S. Hooker*
Michael S. Hooker
Florida Bar No. 330655
PHELPS DUNBAR LLP
100 South Ashley Drive
Suite 2000
Tampa, FL 33602
(813) 472-7866
michael.hooker@phelps.com

*/s/ Andrew G. Phillips*
Andrew G. Phillips*
Jamie S. George*
Ismat Hanano*
andrew.phillips@alston.com
jamie.george@alston.com
esmat.hanano@alston.com
ALSTON & BIRD LLP
1201 West Peachtree St.
Atlanta, GA 30309
(404) 881-7000
* *Admitted Pro Hac Vice*

*Counsel for Defendant*
*The Coca-Cola Company*

/s/ Ian M. Ross
Ian M. Ross
Florida Bar No. 091214
SIDLEY AUSTIN LLP

/s/ *Thomas A. Zehnder*
Thomas A. Zehnder
Florida Bar No. 0063274
Dustin Mauser-Claassen
Florida Bar No. 0119289
KING, BLACKWELL, ZEHNDER
 & WERMUTH, P.A.
25 East Pine Street
Orlando, FL 32801
(407) 422-2472
tzehnder@kbzwlaw.com
dmauser@kbzwlaw.com

Andrew S. Tulumello*
Arianna M. Scavetti*
Joshua M. Wesneski*
Claire Chapla*
WEIL, GOTSHAL & MANGES LLP
2001 M STREET, NW, SUITE 600
Washington, DC 20036
(202) 682-7000
drew.tulumello@weil.com
arianna.scavetti@weil.com
joshua.wesneski@weil.com
claire.chapla@weil.com

Brian G. Liegel
Florida Bar No. 119269
WEIL, GOTSHAL & MANGES LLP
1395 Brickell Avenue

61

830 Brickell Plaza
Miami, FL 33131
(305) 391-5100
iross@sidley.com

Michelle A. Ramirez*
SIDLEY AUSTIN LLP
One S. Dearborn Street
Chicago, IL 60603
(312) 853-7000
michelle.ramirez@sidley.com
* *Admitted Pro Hac Vice*

*Counsel for Defendant*
*The Kraft Heinz Company*

/s/ Joshua T. Fordin
Joshua T. Fordin
Florida Bar No. 125219
KIRKLAND & ELLIS LLP
98 S.E. 7th Street
Suite 700
Miami, FL 33131
(305) 432-5600
joshua.fordin@kirkland.com

Jessica Davidson*
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800
jessica.davidson@kirkland.com

Jordan Michael Schwartz*
KIRKLAND & ELLIS LLP
1301 Pennsylvania Avenue NW
Washington, DC 20004
(202) 389-3358
jordan.schwartz@kirkland.com
* *Admitted Pro Hac Vice*

*Counsel for Defendant*
*Mondelēz International, Inc.*

Suite 1200
Miami, FL 33131
Brian.Liegel@weil.com
* *Admitted Pro Hac Vice*

*Counsel for Defendant*
*PepsiCo, Inc.*

/s/ Todd Norman
Todd Norman
Florida Bar No. 0062154
Vanessa Merassaint
Florida Bar No. 0113023
NELSON MULLINS RILEY & SCARBOROUGH
LLP
390 North Orange Avenue
Suite 1400
Orlando, FL 32801
(407) 669-4200
todd.norman@nelsonmullins.com
vanessa.merassaint@nelsonmullins.com

S. Jamal Faleel*
NORTON ROSE FULBRIGHT US LLP
60 South Sixth Street
Suite 3100
Minneapolis, MN 55402
jamal.faleel@nortonrosefulbright.com
(612) 321-2271
* *Admitted Pro Hac Vice*

*Counsel for Defendant*
*General Mills, Inc.*

/s/ Nichole M. Mooney
Nichole M. Mooney
Florida Bar No. 57908
DEAN, MEAD, EGERTON, BLOODWORTH,
CAPOUANO & BOZARTH, P.A.
420 S. Orange Avenue
Suite 700
Orlando, FL 32801
(407) 841-1200

/s/ Edward Mullins
Edward Mullins
Florida Bar No. 863920
Ana M. Barton
Florida Bar No. 85721
REED SMITH LLP
200 South Biscayne Boulevard
Suite 2600
Miami, FL 33131
(786) 747-0222
emullins@reedsmith.com
abarton@reedsmith.com

Stephen J. McConnell*
REED SMITH LLP
Three Logan Square
1717 Arch Street
Suite 3100
Philadelphia, PA 19103
(215) 851-8100
smcconnell@reedsmith.com
* Admitted Pro Hac Vice

Counsel for Defendant
Conagra Brands, Inc.

/s/ Traci T. McKee
Traci T. McKee
Florida Bar No. 0053088
Blake D. Bachman
Florida Bar No. 1040691
FAEGRE DRINKER BIDDLE & REATH LLP
1500 Jackson Street
Suite 201
Fort Myers, FL 33901
(239) 286-2472
traci.mckee@faegredrinker.com
blake.bachman@faegredrinker.com

Sarah L. Brew*
Tyler A. Young*
Rory F. Collins*
FAEGRE DRINKER BIDDLE & REATH LLP

nmooney@deanmead.com
kgazboda@deanmead.com

Dane H. Butswinkas*
Stephen D. Andrews*
WILLIAMS & CONNOLLY LLP
680 Maine Ave., S.W.,
Washington, DC 20024
Phone: (202) 434-5000
Fax: (202) 434-5029
Email: dbutswinkas@wc.com
sandrews@wc.com
* Admitted Pro Hac Vice

Counsel for Defendant
Mars, Incorporated (improperly named as Mars Incorporated) and Kellanova

/s/ Alvin Lindsay
Alvin Lindsay
Florida Bar No. 939056
HOGAN LOVELLS US LLP
600 Brickell Avenue
Suite 2700
Miami, FL 33131
(305) 459-6500
alvin.lindsay@hoganlovells.com

Lauren S. Colton*
Julie R. Schindel*
HOGAN LOVELLS US LLP
100 International Drive Suite 2000
Baltimore, MD 21202
Telephone: (410) 659-2700
Facsimile: (410) 659-2701
lauren.colton@hoganlovells.com
Julie.schindel@hoganlovells.com
* Admitted Pro Hac Vice

Counsel for Defendant
Nestlé USA, Inc.

/s/ Beth-Ann E. Krimsky
Beth-Ann E. Krimsky

2200 Wells Fargo Center
90 S. 7th Street
Minneapolis, MN 55402
(612) 766-7000
sarah.brew@faegredrinker.com
tyler.young@faegredrinker.com
rory.collins@faegredrinker.com
*Admitted Pro Hac Vice*

*Counsel for Defendant*
*Post Holdings, Inc.*

Florida Bar No. 968412
GREENSPOON MARDER LLP
200 East Broward Boulevard
Suite 1800
Fort Lauderdale, FL 33301
(954) 527-2427
beth-ann.krimsky@gmlaw.com
gabby.mangar@gmlaw.com

Dean N. Panos*
John F. Ward*
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
dpanos@jenner.com
jward@jenner.com
(312) 923-2765
*Admitted Pro Hac Vice*

*Counsel for Defendant*
*WK Kellogg Co.*

64